# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA       . CRIMINAL NO. 10-40019-FDS
                               .
         V.                    . BOSTON, MASSACHUSETTS
                               . FEBRUARY 10, 2011
KIRK LASSEND                   .
    Defendant                  .
. . . . . . . . . . . . . . . .
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE TIMOTHY S. HILLMAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the government:   Cory S. Flashner, Esq.
                      United States Attorney's Office
                      Donohue Federal Building, Rm #206
                      595 Main Street
                      Worcester, MA 01608
                      508-368-0103
                      cory.flashner@usdoj.gov

For the defendant:    Raymond A. O'Hara, Esq.
                      1 Exchange Place
                      Worcester, MA 01608
                      508-831-7551
                      oharalaw@hotmail.com

Court Reporter:

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

1                              **I N D E X**

2  **WITNESSES**          **DIRECT**      **CROSS**         **REDIRECT**          **RECROSS**

3  **Government's:**

4  None

5

6  **EXHIBITS**                  **DESCRIPTION**                         **IN EVIDENCE**

7      1        Deft's Criminal History NY              6

8      2        Deft's Criminal History from

9                  Comm. of Mass.                       6

10     3        Charlton Police Report of Gary Wood     6

11     4        Fitchburg Police Report of

12                 Steven Hachey                        6

13     5        Report of Officer Coreio                6

14     6        Firearms ID Report-Mass. State Police   6

3

**P R O C E E D I N G S**

CASE CALLED INTO SESSION

THE CLERK: The Honorable Timothy S. Hillman presiding. Today's date is February 10, 2011 in the case of USA v. Kirk Lassend, Criminal Action No. 10-40019. Counsel please identify yourself for the record.

MR. FLASHNER: Good afternoon, Your Honor, Cory Flashner on behalf of the government and appearing with me is AUSA Mark Grady who's going to be joining us now.

THE COURT: Welcome, Mr. Grady.

MR. GRADY: Thank you.

MR. O'HARA: Good morning, Your Honor, Raymond A. O'Hara on behalf of Mr. Lassend.

THE COURT: Good morning, Mr. O'Hara, and good morning to you, good afternoon rather to you, Mr. Lassend.

MR. LASSEND: Also with you, sir.

THE COURT: Okay, so this is Mr. Lassend's deferred detention hearing?

MR. O'HARA: Yes.

THE COURT: All right. Attorney Flashner, you may proceed.

MR. FLASHNER: Thank you, Your Honor. Your Honor, I did have an opportunity to speak just briefly moments ago with Attorney O'Hara. There's a chance if we could just have just a minute to speak we may be able to stipulate and it may save the

4

1  Court--
2          THE COURT:  Sure.
3          MR. FLASHNER:  --some time.
4          THE COURT:  Yeah, yeah.
5          MR. FLASHNER:  If I could just have a minute?
6          THE COURT:  Of course.
7  PAUSE
8          THE COURT:  Yes?
9          MR. FLASHNER:  Your Honor, I believe we may be able
10 to proceed via stipulation.  I'm just getting the, there'll be
11 six exhibits that the government would be offering.
12         THE COURT:  Okay.
13         MR. FLASHNER:  I don't think they'll be a need for a
14 lot of testimony today.
15         THE COURT:  Okay.  So you're basically going to
16 submit the exhibits and then argue based upon those.  Is that
17 my understanding?
18         MR. FLASHNER:  Yes, Your Honor.
19         THE COURT:  Okay.
20      PAUSE
21         MR. FLASHNER:  Your Honor, I believe the parties are
22 ready whenever the Court is.
23      PAUSE
24         THE COURT:  Thank you, Mr. Flashner.  Go ahead.
25         MR. FLASHNER:  Go ahead.

5

1    MR. FLASHNER:  Thank you.  Your Honor, the parties
2 having stipulated to the following exhibits.  I would just
3 offer them and then identify them for the Court.  The documents
4 have been provided to defense counsel previously.  Exhibit No.
5 1 being the defendant's criminal history from New York state.
6 Exhibit No. 2 being the defendant's criminal history from the
7 Commonwealth of Massachusetts.  Exhibit No. 3 being a Charlton
8 police report of a Gary Wood, Officer Gary Wood concerning
9 fingerprint identification and linking those, some of those New
10 York state convictions to the instant arrest as well as the
11 Worcester arrest.  Exhibit No. 4 being a Fitchburg police
12 report of a Steven Hachey, H-A-C-H-E-Y, concerning the instant
13 July 12, 2010 incident which forms the basis of the indictment.
14 Exhibit No. 5 being the report of an Officer Coreio, C-O-R-E-I-
15 O.  Again, concerning the July 12, 2010 incident that forms the
16 basis of the indictment.  And Exhibit No. 6 being a firearms
17 identification section report from the Massachusetts state
18 police identifying a discharged shell casing recovered by
19 officers at the scene as coming from the firearm that was
20 recovered near the defendant at the scene.  I'd offer those six
21 exhibits.
22    THE COURT:  Thank you.
23    GOVERNMENT EXHIBIT NOS. 1-6, ADMITTED
24    THE COURT:  Mr. O'Hara, you have the same documents
25 just so we're all on the same page?

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

6

1    MR. O'HARA:  Yes, I do, Your Honor.

2    THE COURT:  All right, let me hear you on those.

3    MR. FLASHNER:  Your Honor, on July 12th the evidence
4 would be and the evidence the government would show at trial
5 was that on July 12, 2010 the defendant was walking on Day
6 Street in Fitchburg, Mass.  He was in the area, more
7 particularly of 90 Day Street, at which time he was observed by
8 several residents to be carrying a firearm.  He was observed
9 not only carrying that firearm but discharging that firearm
10 into the air.  Several of those residents then called 911--

11    THE COURT:  Wait a minute, wait a minute, wait a
12 minute, whoa, stop.  What time of day was this?

13    MR. FLASHNER:  This was the middle of – it was, the
14 exact time, Your Honor, was I believe 7:49 at night is when it
15 was originally entered.

16    THE COURT:  Okay.

17    MR. FLASHNER:  There was – and that's exactly where I
18 was going, Your Honor.  There were children in the street as
19 described by the 911 callers.  They describe their own children
20 being outside, other children being in the street and other
21 people being outside.  The 911 callers make these observations
22 of the defendant.  They don't know him by name but they
23 describe him as a white or Hispanic male with a shaved head, a
24 dark tank top, dark jeans and a scraggly beard, a fairly
25 distinctive description which matches the defendant.  One of

Case 4:10-cr-40019-FDS   Document 29   Filed 04/07/11   Page 7 of 19

7

1  the 911 callers is actually observing him as she's on the
2  phone with the 911 operator saying he just fired the gun.  He's
3  walking and the police are arriving on the scene.  The police
4  have gone to, the police are going to the wrong door, tell them
5  to back up.  Ultimately the officers do, enter into 90 Day
6  Street at which time they encountered the defendant.  Again,
7  the gun having been discharged at least once, according to some
8  witness accounts twice on the street.
9        The officers find the defendant alone in a vestibule
10 or hallway area of 90 Day Street.  At that point he's taken
11 into custody.  A pat frisk is performed and a magazine
12 containing ammunition is recovered from his person.  The
13 officers then look in the hallway area.  It's a fairly small
14 area of a fairly typical two or three story home.  There's one
15 locked door.  There's an unlocked door.  They open the unlocked
16 door which is a common closet area.  It's essentially empty
17 with the exception of a bag and underneath that bag is a
18 firearm. The officers recover that firearm, that firearm being
19 black in color and consistent with the way that the 911 callers
20 describe the defendant having a black firearm.  The defendant's
21 then brought outside at which point a somewhat unorthodox
22 admittedly identification procedure is conducted.  The witness
23 is too scared to go outside so they ask her to look out a
24 window and see who the police have and see whether she can
25 identify that person on the 911 call.  She does indicate that

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

1  that is the person she saw with the gun at which time the
2  defendant is taken into custody.  Once the defendant is taken
3  into custody he was brought to the, as he was taken into
4  custody police officers observed cuts on his hands.  Police
5  officers observed those cuts on his hands and decided to do a
6  well being check at his home which is just right around the
7  corner on Blossom Street, right around the corner from Day
8  Street.  I think it's 73 Blossom.  The officers went there,
9  spoke to the defendant's girlfriend at the time and obtained
10 permission to enter in and conduct a search of the premises.
11 They went down to the basement area of Apartment E at which
12 point they recovered a holster and another magazine.  The
13 magazine clip to my understanding as well as the magazine clip
14 recovered from the defendant both fit the firearm that's
15 recovered in the closet.  So we have the magazine clip on his
16 person, firearm from the closet, the holster recovered in his
17 home and the magazine clip recovered at his home.
18         Additionally, Your Honor, there is a, during booking
19 there's a booking search of the defendant.  The police recover
20 a round of ammunition actually in his pocket.  Subsequent
21 ballistic testing revealed that the discharged shell casing
22 recovered on the street, a tool mark examination of that was
23 consistent with having been fired from the firearm recovered
24 from the closet and the firearm the defendant was charged with.
25         Those are the essential facts of the case, Your

1  Honor, in terms of a, what the government would expect to
2  prove.  I know that probable cause already has been, has issued
3  but I do think it's important that the Court has some kind of
4  context.  It's not what I, I don't like to call a typical but
5  it would be a standard possession of a firearm case and that we
6  actually have someone brandishing the gun waving it about and
7  actually discharging it on a crowded street.  It's the middle
8  of the summer.  There are children and other neighborhood
9  residents about.
10          Turning to the defendant's criminal history--
11          THE COURT:  Wait a minute, just a second.  So, and it
12  really does not make any difference to my analysis I don't
13  think but what was the purpose of them going into Day Street?
14          MR. FLASHNER:  It'd be the government's contention
15  that he was attempting to flee the area or to get away.  There
16  is no known connection between the defendant and the address
17  that he's arrested at, 90 Day Street.
18          THE COURT:  Is there any reason why; is there any
19  ostensible reason why he was shooting the gun off in the first
20  place?
21          MR. FLASHNER:  No, and just to be clear there's no
22  allegation that he was aiming at anyone when he was shooting
23  the gun.  It was more he was shooting the gun in the air.  I
24  just, I don't want to be misrepresenting anything to the Court.
25  There is no known connection between the defendant and 90 Day

10

1  Street though.
2          THE COURT:  Thank you.  Go ahead.
3          MR. FLASHNER:  The defendant presents the Court with
4  a significant criminal history and perhaps first and foremost I
5  can go through his Massachusetts record.  He has, he's an armed
6  career criminal and he's looking at a 15 year mandatory
7  minimum.  He has a Worcester District Court conviction for
8  assault by means of a dangerous weapon and assault and battery
9  by means of a dangerous weapon.  He received a, on April 29,
10 2010 he received a two year suspended sentence, 22 days
11 committed, the balance suspended for a year.  My point in
12 highlighting that first, Your Honor, is to stress to the Court
13 that he was on conditions of release, he was on probation at
14 the time he committed this offense.  He was on--
15         THE COURT:  Do we know what the weapon of choice was?
16         MR. FLASHNER:  I do not know what the weapon was in
17 that particular case and the Board of Probation record doesn't
18 reflect it.
19         THE COURT:  They usually do actually.
20         MR. FLASHNER:  It seems to be, it just says ABDW.  It
21 doesn't say--
22         THE COURT:  Mmm-hmm.
23         MR. FLASHNER:  --shod foot or firearm or--
24         THE COURT:  All right.
25         MR. FLASHNER:  I may well have that report and I can

11

1   try to lay my hands on it in just a moment, Your Honor.  He
2   has, also has in addition to that case he has a significant
3   history out of New York state.  He has a – the New York record
4   is a little bit difficult to read, Your Honor, and I'm just
5   going to refer to them by cycles.  If you look at the top of
6   each entry where it starts to talk about a particular incident
7   it refers to it as a cycle and then cycle, the cycle being the
8   history of that particular criminal case as it went through the
9   system.
10          Cycle two on the defendant's criminal history out of
11  New York states which has been marked as an exhibit for
12  purposes of this hearing as Exhibit No. 1, that is a robbery in
13  the first degree conviction.  He was convicted under an alias,
14  the name being Alex Lopez.  That conviction date is July 21,
15  1992 and he was sentenced to two to six years.  He has a second
16  robbery in the first degree conviction under the name Roberto
17  Lassend.  He was convicted in that case out of Queens County in
18  September 10, 1997 and that's cycle number three on his
19  criminal history.  He received 102 months to 10 years on that
20  particular cycle on that particular charge.
21          He also has an attempted assault in the second degree
22  out of the Bronx court, Bronx County court under the name Kirk
23  Lassend.  That's cycle number four in his criminal history.
24  The date of conviction being I believe January 13, 1998.  He
25  received 18 months to three years committed on that charge.  He

1  has attempted possession of prison contraband out of the
2  Franklin County court in New York state as well; cycle number
3  five, the conviction date being May 26, 2004.  He received 18
4  months to three years on that particular charge.
5           There's been a fingerprint comparison conducted of
6  the cycle two robbery conviction under the name Alex Lopez, the
7  cycle three robbery conviction under the name Roberto Lassend,
8  the ABDW and ADW case out of the Worcester court under the name
9  Kirk Lassend with the prints in this particular arrest.  That
10 is Exhibit 3 that has been submitted to the court and the
11 examiner; Officer Gary Wood determined that in fact those
12 prints all come from the same individual.
13          In short, Your Honor, you have a defendant who's
14 before the Court today looking at a 15 year mandatory minimum
15 sentence and up to life incarceration.  He's charged with being
16 a felon in possession of ammunition and a felon in possession
17 of a firearm.  Even if, and I'm not suggesting that it's likely
18 to happen but if for some reason there was an issue with the
19 firearm at trial there's a bullet that's recovered on his
20 person.  The defendant I would suggest to the Court stands a
21 substantial likelihood of being convicted and based upon his
22 prior criminal history stands a substantial likelihood of being
23 convicted as an armed career criminal.
24          Moreover, looking at the detention statute under 18
25 U.S.C. 3142 I believe it's (f)(1)(B) I suggest that detention

1  would be appropriate as the maximum term he faces there's a
2  potential for life imprisonment.  Additionally his prior
3  criminal history and his lack of connections to the area, I'm
4  sure defense counsel will have something, some information on
5  that.  He may well have more information than I have.  I'm
6  looking at his criminal history and see someone that has
7  substantial ties to New York and a criminal history in New York
8  and not much history here in Massachusetts.
9       I'd suggest that the nature and circumstances of the
10 offense, firing a gun in, I'm not going to call it the middle
11 of the day but in the early evening in the summertime on a
12 crowded street in a neighborhood, the strength of the
13 government's case as well as the defendant's past conduct and
14 criminal history would make him a candidate for detention and
15 release would be inappropriate at this time.  I'd suggest that
16 the nature and seriousness of this particular defendant do pose
17 a danger to the community and detention is warranted given the
18 facts when taken in total.  Thank you.
19       THE COURT:  What was the caliber of the gun?
20       MR. FLASHNER:  The caliber of the gun is a 7--
21       THE COURT:  Oh, I got it.  I see it, never mind.
22       MR. FLASHNER:  And, Your Honor, just if I can touch
23 on that.  The nine – it's interesting because the ammunition
24 recovered from his pocket is a nine millimeter and it's
25 actually a 7, I believe it's 742 or 762--

1           THE COURT:  762.

2           MR. FLASHNER:  762.  It's my understanding that you
3  could fire a nine millimeter shell casings from that but it may
4  be somewhat difficult.  The gun may jam.  The reason that
5  that's significant is that the 911 caller described him as
6  banging the gun, blowing into it, making motions like someone
7  who has in fact jammed the gun which would be consistent with
8  someone trying to use 9mm ammunition which works in that
9  particular handgun but isn't specifically manufactured for it.

10          THE COURT:  Thank you.

11          MR. FLASHNER:  Thank you.

12          THE COURT:  Attorney O'Hara, please.

13          MR. O'HARA:  Yes.  Your Honor, I have through
14 Mr. Lassend contacted his family in New York and I've also
15 spoken at length with Ms. Horne (ph), Stephanie Horne who is
16 the mother of his child.  She gave birth on January 9th to his
17 daughter.  Ms. Horne tells me that she has known Mr. Lassend
18 and been with him for more than a year, and I found out from
19 his family that the problems he had in New York were basically
20 based around a youth spent on the streets of New York with
21 automobile thefts.  The criminal activity that's reflected on
22 his record, at least two of the convictions occurred while he
23 was incarcerated in New York state and got involved in an
24 altercation with other inmates while he was being detained in
25 New York states.

When he was released from prison he came to Massachusetts because he wanted to make a new start.  He had a relative living up here and he resettled into the Fitchburg area which is where he met Ms. Horne.  He began working for a temporary agency and the work was sporadic.  Ms. Horne is a certified nursing assistant and she told me that Mr. Lassend was a godsend to her in terms of the fact that she didn't have to have daycare when Mr. Lassend was around because he was able to take care of her three year old by a prior relationship and that he served as a surrogate parent for this child.  She would be willing to serve as a third party custodian if the Court was inclined to release Mr. Lassend.

In speaking with Ms. Horne and with his father they indicate that he has a problem at times with alcohol and that when he's not drinking he's absolutely a pleasure to be around.  And it's been my experience in interacting with him five or six times down at Wyatt that he's extremely respectful, he's articulate and this conduct that he's accused of does not appear to be characteristic of the person I've met or who Ms. Horne lived with or whose father raised.

In terms of his record also I couldn't find any defaults.  I don't believe he's a risk of flight.  The problem he has is with the nature and the extent of this case and the nature of his previous record.  There was a, on the evening that he was arrested he was taken and he was searched and he

1  also had his hands subjected to a forensic examination to see
2  if there was any gun powder residue on either of his hands.
3  I've listened to the 911 calls and one of the callers indicates
4  that the weapon was discharged twice.  In spite of that the
5  forensic examination of his hands revealed no gun powder
6  residue and they couldn't make any conclusion that he was
7  firing a gun.
8       He had secured full time work with JR Hard Floors
9  shortly before this happened.  He'd been working there for
10 three months.  And his girlfriend or common law wife describes
11 him as a relatively perfect partner to her and she was very
12 upset by the fact that he was arrested on this case and
13 couldn't really understand why.
14      For those reasons I'm asking the Court to consider
15 releasing him on conditions whether you'd want to send him down
16 to Dimic for further treatment for what appears to be an
17 alcohol problem or whether if he was released upon the
18 conditions that he submit, you know, random urinalysis at least
19 once a day to make sure that he's not drinking he'd be
20 amendable to that.  But above all I'm seeking on behalf of Ms.
21 Horne who would like him to be released so that he could share
22 with the child caring responsibilities.  When he found out that
23 she was pregnant he was very excited.  He has no children and
24 this was his first child and from what she tells me he's very
25 good around children and this is a bigger disappointment to her

17

1  than to him that he couldn't be present during the birth of
2  his child and he can be present during the child rearing
3  phasing of the infant's life.
4           THE COURT:  Thank you.
5           Okay, I want to talk with Ms. Cuascut and think about
6  this a little bit.  I'm going to take it under advisement.
7  Nice job everybody.  We're in recess.
8           MR. FLASHNER:  Thank you, Your Honor.
9  //
10 //
11 //
12 //
13 //
14 //
15 //
16 //
17 //
18 //
19 //
20 //
21 //
22 //
23 //
24 //
25 //

18

1  //

2                          CERTIFICATION

3      I, Maryann V. Young, court approved transcriber, certify

4  that the foregoing is a correct transcript from the official

5  digital sound recording of the proceedings in the

6  above-entitled matter.

7

8  /s/ Maryann V. Young                April 7, 2011

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

1

1

***MARYANN V. YOUNG***
**Certified Court Transcriber**
**(508) 384-2003**